This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

v.                                                              **NO.   29,595**

**ERIC STALLWORTH,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Stan Whitaker, District Judge**

Gary K. King, Attorney General
Santa Fe, NM

Francine A. Chavez, Assistant Attorney General
Albuquerque, NM

for Appellee

Law Works L.L.C.
John A. McCall
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**BUSTAMANTE, Judge.**

Defendant Eric Stallworth was convicted of eight counts of criminal sexual penetration of a minor (CSPM), three counts of kidnapping, two counts of criminal sexual contact of a minor (CSCM), three counts of child abuse (intentionally caused) (no death or great bodily harm), and three counts of child abuse (negligently caused) (no death or great bodily harm). The district court sentenced Defendant to a term of seventy-five years, of which twelve were suspended. The court also found that the child abuse charges were serious violent offenses pursuant to NMSA 1978, Section 33-2-34 (2006), the Earned Meritorious Deductions Act (EMDA).

Defendant argues that it was error to designate his child abuse convictions as serious violent offenses, that his child abuse convictions violate double jeopardy, that his child abuse convictions were not supported by substantial evidence, and that the district court abused its discretion by admitting various items of evidence. We reverse the designation of child abuse as a serious violent offense, reverse the negligent child abuse convictions with instructions that they be vacated, and affirm the remaining convictions.

**DISCUSSION**

Defendant raises eight issues on appeal. We first address his arguments that his child abuse convictions (1) should not have been deemed serious violent offenses, (2) violated his right to be free of double jeopardy, and (3) were not supported by

substantial evidence. We then address his five remaining arguments, each of which contends that the district court abused its discretion in its handling of various evidentiary matters. Because the parties are familiar with the facts and proceedings, and because this is a memorandum opinion, we do not provide a detailed discussion of this case's background. We include background information as necessary in connection with each issue raised.

**A.    Serious Violent Offense**

Defendant contends that the district court abused its discretion in determining that the child abuse convictions were violent offenses for the purposes of the EMDA. The State counters that the district court did not abuse its discretion because its findings were consistent with the EMDA statutory requirements. We review a court's decision to designate a defendant as a violent offender under the EMDA for abuse of discretion. *See State v. Lavone*, 2011-NMCA-084, ¶ 5, __, N.M. __, __ P.3d __.

The EMDA permits prisoners to earn "meritorious deductions" for certain activities. *See* § 33-2-34. However, a prisoner's ability to earn these deductions is limited if he has been convicted of a serious violent offense. *See* § 33-2-34(A)(1). The EMDA designates certain crimes, including the CSPM, CSCM, and kidnapping convictions in this case, as serious violent offenses. Section 33-2-34(L)(4). The EMDA also defines what we will refer to as "discretionary crimes," including the

3

child abuse convictions in this case, which may be designated as serious violent offenses at the discretion of the sentencing court. Section 33-2-34(L)(4)(o).

Although a district court has some freedom in designating a discretionary crime as a serious violent offense, its freedom is not unbounded. A court may not designate a crime as a serious violent offense unless it is enumerated in subsection (o). *See State v. McDonald*, 2004-NMSC-033, ¶ 23, 136 N.M. 417, 99 P.3d 667. Furthermore, a discretionary crime may only be designated as a serious violent offense if "the district court . . . determine[s] that the crime was 'committed in a physically violent manner either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm.'" *State v. Solano*, 2009-NMCA-098, ¶ 10, 146 N.M. 831, 215 P.3d 769 (quoting *State v. Morales*, 2002-NMCA-016, ¶ 16, 131 N.M. 530, 39 P.3d 747). Finally, the determination "must be based on something more than the mere elements of the crime." *Lavone*, 2011-NMCA-084, ¶ 8.

Our cases have emphasized the need for the district court to make appropriate supporting findings when designating a discretionary crime as a serious violent offense. This Court first examined what findings are necessary to support a serious violent offense designation in *Morales*. We noted that the discretionary offenses "are characterized by multiple ways of committing the offense, some intentional and some

4

not, and some utilizing physical force and some not." *Morales*, 2002-NMCA-016, ¶ 15. By way of example, we noted that "child abuse can result in death or it can result in no injury whatsoever." *Id.* Comparing the nature of the enumerated serious violent offenses with the discretionary ones, we concluded that the Legislature "wanted to reserve the serious violent offenses for those found by the trial judge to be committed in a physically violent manner either with an intent to do serious harm or with recklessness in the face of knowledge that one's acts are reasonably likely to result in serious harm." *Id.* ¶ 16. Although the *Morales* Court found support for these factors in the record, it declined to affirm the designation, concluding that "it [wa]s for the trial court in the first instance to make the required findings." *Id.* ¶ 18. Accordingly, it reversed as to the serious violent offense designation and remanded for reconsideration and possible additional findings. *Id.* ¶¶ 18-19.

We have consistently required supporting findings since *Morales* was decided. In *State v. Loretto*, the district court found that the defendant's CSCM conviction was a serious violent offense. 2006-NMCA-142, ¶ 1, 140 N.M. 705, 147 P.3d 1138. Because the district court had not made findings corresponding to the *Morales* standard, we reversed. We emphasized that the need to "make specific findings both to inform the defendant being sentenced of the factual basis on which his good time credit is being substantially reduced, and to permit meaningful and effective appellate

5

review of the court's designation." *Id.* ¶ 12. Because "there [was] nothing in the record showing what the court relied on that would permit application of the *Morales* standard," we reversed the serious violent offender designation and remanded for reconsideration and additional findings. *Id.* ¶¶ 19, 22. Similarly, in *State v. Scurry*, the district court designated a vehicular homicide as a serious violent offense. 2007-NMCA-064, ¶¶ 2-3, 141 N.M. 591, 158 P.3d 1034. The only findings were that the accident resulted in death, the defendant had a prior DWI conviction, and the defendant's blood alcohol level was four times the legal limit. *Id.* ¶ 12. We concluded that these findings were insufficient to allow us to ascertain the defendant's "intent or degree of recklessness without considerable inference." *Id.* Accordingly, we held:

> Because the district court did not connect [the d]efendant's prior DWI conviction or level of intoxication to the offense or state the reasons why these facts established a knowledge on [the d]efendant's part that his acts would result in serious harm, the district court did not complete its responsibility to provide sufficient findings under *Morales*.

*Scurry*, 2007-NMCA-064, ¶ 14. The case was sent back to the district court for additional findings to be made. *Id.*

In this case, the district court held a sentencing hearing on April 6, 2009. The court imposed a sentence of 183 years, but suspended all but sixty-three years. The sixty-three years reflected eighteen years each for three of the CSPM convictions and

6

three years each for three of the child abuse convictions. The State argued that the CSPMs were serious violent offenses, and that the child abuse from forcing the other children to watch the seriously violent CSPMs was therefore also a seriously violent offense. Defendant countered that the child abuse was not violent because the violence was addressed by the CSPM and other charges, and the child abuse victims "were merely being forced to watch." Ultimately, the court agreed with the State that "being forced to watch what [is] certainly characterize[d] as a serious violent offense" was itself a serious violent offense.

The district court's findings were not sufficient to support a serious violent offense designation. The court's sole finding appears to be that because the CSPMs in this case were mandatory serious violent offenses, the child abuse convictions based on forcing children to watch the CSPMs were also serious violent offenses. It is possible that this finding goes to the requirement that the offense be committed "in a physically violent manner." However, it does not address, nor are we aware of a finding that does address, Defendant's intent to do serious harm or his recklessness in the face of knowledge that serious harm would result. Although it is not difficult to see a basis for the necessary findings in this case, it is not for us to make these findings for the first time on appeal. We therefore reverse the designation of the child

abuse convictions as serious violent offenses and remand for reconsideration and, if necessary, additional findings.

As is evident from the discussion above, many of our recent cases dealing with the district court's power under the EMDA to designate the offenses in Section 33-2-34(L)(4)(o) have resulted in reversals to allow reconsideration and appropriate findings. Our case law is extremely clear: without findings supporting the factors of the *Morales* standard, a serious violent offense designation will not be affirmed. We therefore take this opportunity to remind and encourage the district courts to make explicit findings, preferably in the judgment and sentence, when designating a discretionary offense as a serious violent offense for the purposes of the EMDA. These findings should address the relevant factors of the *Morales* test and will help avoid unnecessary delay.

**B.      Double Jeopardy**

Defendant argues that the CSPM charges were lesser included offenses subsumed within the child abuse charges, and that his convictions of both violate double jeopardy. Under this view, which we label the "same victim" theory, the child abuse convictions were not based on the victim watching the CSPM of another, but instead on the victim being penetrated by Defendant—the same behavior that the CSPM of the victim was based on. The State, on the other hand, argues that multiple

8

convictions do not violate double jeopardy because the child abuse convictions were not based on the children being penetrated, but on the children watching the CSPMs of the other children. We refer to this as the "different victim" theory.

The constitutional prohibition against double jeopardy "protects against both successive prosecutions and multiple punishments for the same offense." *State v. Mora*, 1997-NMSC-060, ¶ 64, 124 N.M. 346, 950 P.2d 789, *abrogation recognized on other grounds by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683. In determining whether multiple punishments are permissible, we apply a two-prong test. *Swafford v. State*, 112 N.M. 3, 13, 810 P.2d 1223, 1233 (1991). Multiple punishments violate double jeopardy if the underlying conduct is unitary and the Legislature did not intend to create separately punishable offenses. *Id.* To determine legislative intent, we employ the test from *Blockburger v. United States*, 284 U.S. 299 (1932), which instructs us that "if each statute requires an element of proof not required by the other, it may be inferred that the [L]egislature intended to authorize separate application of each statute." *Swafford*, 112 N.M. at 9, 810 P.2d at 1229.

We must first address Defendant's argument that "the [c]hild abuse counts should merge with each other." It is not clear what Defendant means by this undeveloped argument. However, to the extent that Defendant argues that he cannot be convicted of both intentional and negligent child abuse for the same conduct, we

9

agree. *See State v. Schoonmaker*, 2008-NMSC-010, ¶ 46 n.4, 143 N.M. 373, 176 P.3d 1105 (noting that negligent child abuse is not a lesser included offense of intentional child abuse, and that the two are mutually exclusive crimes). We apply the remedial doctrine of merger and vacate the conviction of the lesser crime. *See State v. Santillanes*, 2001-NMSC-018, ¶ 28, 130 N.M. 464, 27 P.3d 456. However, both negligent and intentional child abuse carry the same degree of punishment. *See* NMSA 1978, § 30-6-1(E) (2004) (amended 2009). Furthermore, neither is a lesser included offense of the other. All other aspects of the convictions being equal, we conclude that intentional child abuse is the greater crime because intentional behavior is a higher standard of mens rea than negligent behavior. We therefore reverse the convictions for negligent child abuse and remand with instructions that they be vacated.

Having narrowed our inquiry to the three intentional child abuse convictions, we turn next to Defendant's argument that the CSPM convictions are lesser included offenses of the child abuse charges. In support of this argument, Defendant points to *State v. Mann*, 2000-NMCA-088, 129 N.M. 600, 11 P.3d 564. In *Mann*, a father was convicted of second degree murder and intentional child abuse for killing his six-year-old son with a screwdriver. *Id.* ¶¶ 1, 3. Because both convictions were based on the stabbing, the court found that the conduct was unitary. *Id.* ¶ 9. The court next

concluded that child abuse and murder could "stand independently and thus the elements of one are not subsumed within the other." *Id.* ¶ 13. Ordinarily, this would mean multiple punishments were appropriate. However, relying on "the general rule that one homicide by the acts of one defendant should result in one homicide conviction," the court concluded that the father could not be convicted on both charges without violating his right to be free from double jeopardy. *Id.* ¶¶ 2, 14.

Defendant cannot rely upon *Mann* for its analysis of legislative intent, which involved not only a different crime (murder) but also an exception that only applies to murder. Instead, we understand the reference to *Mann* as an attempt to illustrate the single-victim theory. In *Mann*, the convictions of both child abuse and murder violated double jeopardy because they were both based upon the same act: the defendant stabbing his son. Defendant argues that, like the convictions in *Mann*, his convictions were based on the same act: the penetration of the victim. He then argues that the elements of CSPM are subsumed within the elements of child abuse. He concludes that there is unitary conduct and no intent for multiple punishments, and therefore the convictions violate double jeopardy.

Defendant acknowledges that the child abuse convictions might have been based on viewing the CSPMs, but argues that the child abuse jury instructions "do not specify that the endangerment contemplated was the endangerment inherent in

11

witnessing the molestation of another child." Accordingly, there was no way to know whether the child abuse convictions were based on the CSPM of the child abuse victim, or the witnessing of the CSPM of a different victim. Generally, when a jury instruction allows conviction on alternate theories and one of those theories would violate double jeopardy, the instruction violates the protections against double jeopardy. *See State v. Foster*, 1999-NMSC-007, ¶ 27, 126 N.M. 646, 974 P.2d 140 ("[T]he Double Jeopardy Clause does require a conviction under a general verdict to be reversed if one of the alternative bases for conviction provided in the jury instructions is 'legally inadequate' because it violates a defendant's constitutional right to be free from double jeopardy."); *abrogation recognized on other grounds by Kersey*, 2010-NMSC-020, ¶ 12; *see also State v. Montoya*, 2011-NMCA-074, ¶ 43, 150 N.M. 415, 259 P.3d 820 (observing that the state can avoid double jeopardy problems by identifying specific, non-unitary conduct in the jury instructions).

Our Supreme Court recently explained that a modified version of the *Blockburger* test applies to generic or multi-purpose statutes. In *State v. Gutierrez*, a child shot a man and stole his car. 2011-NMSC-024, ¶ 1, 150 N.M. 232, 258 P.3d 1024. A jury convicted the child of both armed robbery and of the unlawful taking of a motor vehicle. *Id.* ¶ 48. The child argued that this violated the Double Jeopardy Clause by imposing multiple punishments for the same offense. *Id.* While both

statutes required proof of theft, the broad armed robbery statute required proof of theft of "*anything* of value" and the narrow automobile theft statute required proof of theft of an automobile. *See id.* Our Supreme Court adopted a modified version of the *Blockburger* test that looked to the State's theory of the case to define the scope of statutory elements that were "vague and unspecific." *Id.* (internal quotation marks omitted). Applying this test, the Court concluded that under the State's theory in *Gutierrez*, the required elements of armed robbery and of automobile theft were identical—theft of the car and keys—and double jeopardy was violated. *Id.* ¶ 60. In doing so, it distinguished an earlier case involving the same statutes in which it had held that double jeopardy was not violated because the "*anything* of value" element referred to the car keys and not to the car itself. *See id.* ¶ 57 (distinguishing *State v. McGruder*, 1997-NMSC-023, 123 N.M. 302, 940 P.2d 150).

Like the armed robbery statute in *Gutierrez*, the child abuse statute "is a generic, multipurpose statute." 2011-NMSC-024, ¶ 58. In *Gutierrez*, the robbery statute required the State to prove that the defendant had stolen "*anything* of value." *Id.* (internal quotation marks and citation omitted). The Court determined that the meaning of this broad phrase was defined by the State's legal theory. *Id.* Here, the child abuse instructions required the State to prove that victims had been "placed in a situation which endangered the[ir] life or health." We have observed that "child

13

abuse can result in death or it can result in no injury whatsoever." *Morales*, 2002-NMCA-016, ¶ 15. Indeed, our Supreme Court has expressed concerns that the breadth of this statute is dangerously close to unconstitutional. *See State v. Graham*, 2005-NMSC-004, ¶ 23, 137 N.M. 197, 109 P.3d 285 (Chavez, J., specially concurring) (suggesting that child abuse by endangerment "may be a vague and overbroad statute"); *id.* ¶ 35 (Bosson, J., dissenting) (warning that the broad reading of the child abuse statute raised due process concerns). We conclude that the breadth of the statute renders it generic and multipurpose.

Because the intentional child abuse statute is generic and multipurpose, we apply *Gutierrez* and look to the State's theory of the case to give meaning to the generic element. Although on appeal Defendant argues otherwise, the record reveals that the parties and the district court understood the State's child abuse arguments to relate to forcing the children to watch the CSPMs of the other children. During the sentencing hearing, the Defendant noted that "the theory that the State advanced in regards to the child abuse . . . is that . . . each of the children was compelled to watch as the other children were molested." Defendant based its entire argument that the child abuse charges should not be designated a serious violent offense because "the victims were merely being forced to watch." The State made this argument below and on appeal. Under *Gutierrez*, this theory guides our interpretation, and we conclude

14

that the generic element of child abuse, that the victims be "placed in a situation which endangered the[ir] life or health," required proof that the child abuse victims were forced to watch the CSPMs of the other children. Since proof that one child was forced to watch the CSPM of another is different from proof that one child was herself a victim of CSPM, we conclude that the Legislature intended multiple punishments under these circumstances, and there was therefore no double jeopardy violation.

## C.    Child Abuse - Sufficiency

Defendant argues that his convictions of child abuse were not supported by substantial evidence because the State "failed to provide evidence of the emotional damage to the children [from] watching the rapes." The State contends that Defendant failed to meet his burden of providing an adequate record to review this issue and urges that we should refuse to deal with the issue on its merits. We disagree.

"[T]he question of sufficiency of the evidence to support a conviction may be raised for the first time on appeal." *State v. Stein*, 1999-NMCA-065, ¶ 9, 127 N.M. 362, 981 P.2d 295. "[T]he test to determine the sufficiency of evidence in New Mexico . . . is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). "In reviewing the sufficiency of the evidence, we must view the

evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176.

To prove the child abuse charges, the State was required to show that Defendant caused the children "to be placed in a situation which endangered the[ir] life or health." Our Supreme Court has described the standard for endangerment under the child abuse statute:

> [B]y classifying child endangerment as a third-degree felony, our Legislature anticipated that criminal prosecution would be reserved for the most serious occurrences, and not for minor or theoretical dangers. Therefore, we have taken a more restrictive view of the endangerment statute, and have interpreted the phrase "*may* endanger" to require a "reasonable probability or possibility that the child will be endangered."

*State v. Chavez*, 2009-NMSC-035, ¶ 16, 146 N.M. 434, 211 P.3d 891 (internal quotation marks and citations omitted).

The State elicited the following testimony. K.R. testified that Defendant anally and vaginally raped her in the presence of T.P. and J.R. K.R. also testified that she saw Defendant do the same thing to T.P. and J.R. J.R. testified that Defendant anally raped her while she was in bed with K.R. and T.P. She also testified that she had seen Defendant touching T.P. and K.R. T.P. testified that Defendant vaginally raped her in the presence of J.R. and K.R. and that she could see that both children were awake.

16

T.P. also testified that she saw Defendant do the same thing to the J.R. and K.R. that he had done to her. J.R. and K.R. were sisters, and T.P. was their god sister.

Viewing the children's testimony in the light most favorable to the verdict, a jury could reasonably find that each child witnessed Defendant commit the CSPMs on the other children. The jury could reasonably infer from this that Defendant endangered the mental or emotional health of the children. We do not believe that a jury would require expert or other direct testimony to conclude that watching one's seven-, eight-, or ten-year-old sister or god sister be raped would create a reasonable probability of danger to the mental health of the children. *See Graham*, 2005-NMSC-004, ¶ 12 (observing that it was "common knowledge" that the same amount of an intoxicant could affect people of different ages differently and concluding that it was "within the jurors' experience to decide whether the amount of accessible marijuana endangered the health of" the children). *But see State v. Trujillo*, 2002-NMCA-100, ¶ 20, 132 N.M. 649, 53 P.3d 909 ("In theory, the [s]tate might lay an adequate evidentiary foundation proving the likelihood of harm to a child's emotional health as a result of witnessing such an attack on her mother. . . . However, the [s]tate presented no such evidence in this case.").

**D.     Evidentiary Issues**

In addition to his EMDA and double jeopardy arguments, Defendant has raised five issues relating to the evidence in this case. "Generally speaking, a reviewing court defers to the trial court's decision to admit or exclude evidence and will not reverse unless there has been an abuse of discretion. However, our review of the application of the law to the facts is conducted de novo." *State v. Martinez*, 2008-NMSC-060, ¶ 10, 145 N.M. 220, 195 P.3d 1232 (internal quotation marks and citation omitted).

**1.     Dr. Ornelas - T.P. & J.R. - Rule 11-803(D) NMRA**

Defendant argues that it was error to admit Dr. Ornelas' testimony that the normal physical examinations of T.P. and J.R. were consistent with T.P. and J.R. being sexually abused. Specifically, Defendant contends that Dr. Ornelas introduced impermissible hearsay accounts of J.R. and T.P.'s self-reported histories and that Dr. Ornelas' testimony was more prejudicial than probative. The State counters that Dr. Ornelas' testimony was permissible under *State v. Mendez*, 2010-NMSC-044, 148 N.M. 761, 242 P.3d 328, and that even if it was not, any error was harmless.

Hearsay is inadmissible unless it falls within an exception. *See* Rule 11-802 NMRA. One exception is Rule 11-803(D), which allows the admission of "[s]tatements made for purposes of medical diagnosis or treatment and describing

18

medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." In *Mendez*, our Supreme Court clarified how Rule 11-803(D) applies to the testimony of SANE nurses. 2010-NMSC-044, ¶ 41. Rejecting the previous rule directing courts to consider the purpose of the patient's encounter with the SANE nurse, *Mendez* instructed courts to consider individual statements made to SANE nurses to determine "whether a medical provider could have reasonably relied on the statement for diagnosing or treating the declarant." *Id.* ¶ 43.

Although Defendant has cited various authorities that might support an argument on appeal, we agree with the State that he has presented us with no specific argument to address. *See Farmers, Inc., v. Dal Mach. & Fabricating, Inc.*, 111 N.M. 6, 8, 800 P.2d 1063, 1065 (1990) (stating that the burden is on the appellant to clearly demonstrate that the trial court erred). Defendant fails to cite or quote any individual statement made to the SANE nurse that was inadmissible hearsay. Nor does Defendant point us to objections that were made at trial on these grounds. Defendant does cite various pretrial comments or rulings, but does not identify how these were specifically violated by Dr. Ornelas' testimony. And although Defendant has cited to a span of approximately one hundred pages of testimony, it is not our role to scrutinize

each sentence in these hundred pages in search of error. In short, Defendant has pointed to no error, and we therefore find none.

**2.    Dr. Ornelas - J.R.'s Second Exam**

Defendant next argues that the district court erred in allowing Dr. Ornelas to testify regarding a second examination of J.R. because the testimony "did not provide any usable medical evidence to support the State's case" and served only to vouch for the credibility of J.R. The State asserts that this objection was not preserved, that there was no fundamental or plain error, and that any error was harmless.

We understand Defendant's first argument, that the histories "did not provide any usable medical evidence to support the State's case," to refer to the lone sentence where Defendant made the bare assertion that the evidence regarding the second examination of J.R. was "not relevant or, if relevant, was more prejudicial than probative." But Defendant does not suggest why the evidence was not relevant, nor does he explain how it was prejudicial. We decline to address this undeveloped argument. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076. We also agree with the State that these objections were not made at trial. *See Woolwine v. Furrs, Inc.*, 106 N.M. 492, 496-97, 745 P.2d 717, 721-22 (Ct. App. 1987).

Defendant's second argument is that Dr. Ornelas' testimony about the second exam was impermissible vouching. In *State v. Alberico*, our Supreme Court explained that expert testimony is not admissible "to tell the jury that a witness is telling the truth." 116 N.M. 156, 175, 861 P.2d 192, 211 (1993). Defendant does not identify any specific testimony that violated this rule and, consequently, has not explained how the rule was violated. In fact, Dr. Ornelas' testimony explained what happened at J.R.'s follow-up examination and why such examinations were necessary and routine. Dr. Ornelas did not testify, explicitly or by implication, that J.R. was telling the truth. Dr. Ornelas' testimony therefore did not invade the province of the jury and did not constitute impermissible vouching.

**3.      Failure to Give Cautionary Instructions**

Defendant argues that the district court erred by refusing to instruct the jury that the histories of J.R. and T.P. should not be considered as substantive evidence. This argument essentially repeats his previous argument that the testimony regarding the second examination of J.R. was impermissible vouching or was either irrelevant or more prejudicial than probative. However, Defendant also relies on *Alberico* for the proposition that failure to give curative instructions is error when an expert comments on the victim's truthfulness or the perpetrator's identity. Although Defendant cites to portions of the record where he claims Dr. Ornelas made these types of comments,

21

we find no such statements. His reliance on *Alberico*'s holding that experts should not comment on veracity or identity is therefore misplaced.

**4.      Admission of Rape Kits**

Defendant argues that the district court erred in admitting the rape kits for the three victims into evidence without proper foundation. The gist of this one-paragraph argument appears to be that the kits were not admitted through the testimony of the Nurse who had signed the evidence tags. The State argues that introduction of the kits through Dr. Ornelas was appropriate because Dr. Ornelas had signed the envelopes containing the swabs, and because Dr. Ornelas was present when Nurse Shaw collected the clothes and put them in the sealed envelopes.

We review the admission of the rape kits for abuse of discretion.

> In order to admit real or demonstrative evidence, the evidence must be identified either visually or by establishing custody of the object from the time of seizure to the time it is offered into evidence. . . . Admission of evidence is within the trial court's discretion and there is no abuse of that discretion when the evidence is shown by a preponderance of the evidence to be what it purports to be.

*State v. Peters*, 1997-NMCA-084, ¶ 26, 123 N.M. 667, 944 P.2d 896 (citations omitted). Here, many of the items in the rape kit were collected and sealed by Dr. Ornelas, and were therefore properly admitted. While some of the clothing was sealed by a nurse, Dr. Ornelas identified the clothing as the same clothing that was collected and sealed in her presence. Because Dr. Ornelas visually identified the clothing, the

court did not abuse its discretion in concluding that the items were what they purported to be and in admitting them as evidence. *See id.*

**5.    Admission of J.R.'s Diagrams**

Defendant argues that the district court abused its discretion in admitting diagrams J.R. made showing how she had been assaulted because the diagrams were only for the purpose of refreshing the witness's memory. The State contends that the prior drawing was not admitted into evidence, and that the three admitted drawings were made by J.R. at trial.

A review of the record reveals that the State's version is correct. The State initially tried to use Exhibit 2 to refresh J.R.'s recollection. J.R. indicated that the picture was not helping her to remember. The State then changed its tactic, providing J.R. with a blank drawing of a girl she could use to indicate where she had been touched. This drawing was marked as State's Exhibit 3 and 4. The State then drew what appeared to be a smiling gingerbread man, meant to represent Defendant, and marked it as Exhibit 5. J.R. circled the parts of the gingerbread man that corresponded to the parts that Defendant had used to touch her.

The State offered Exhibits 3, 4, and 5 into evidence. Defendant objected, arguing that "[t]he whole purpose of the State's 3, 4 and 5 is the same purpose as Exhibits 1 and 2 that is to allow her to remember things that she couldn't remember

otherwise." The State argued that the drawings were similar to photographs, and that J.R. had drawn them from memory without being led. The court agreed and admitted the drawings into evidence.

Defendant's argument is based on his claim that Exhibits 3, 4, and 5 were safehouse drawings used to refresh J.R.'s memory. Because the record does not support the facts upon which Defendant's argument is based, the argument fails.

**CONCLUSION**

For the foregoing reasons, we reverse the convictions for negligent child abuse and remand for them to be vacated. We reverse the designation of the intentional child abuse convictions as serious violent offenses and remand for additional fact finding, if any. The remainder of the judgment and sentence is affirmed.

**IT IS SO ORDERED.**

_____

**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**CYNTHIA A. FRY, Judge**

_____

**LINDA M. VANZI, Judge**

24